ELECTRONICALLY FILED
Benton County Circuit Court
Brenda DeShields, Circuit Clerk
2020-Aug-07  12:01:36
04CV-20-1703
C19WD02 : 21 Pages

## IN THE BENTON COUNTY CIRCUIT COURT
## CIVIL DIVISION

RODNEY & JAYME BAKER,                  )
Individually and As Parents and Next   )
Friends of IB, a minor,                )
                                       )
Plaintiffs                             )
                                       )
v.                                     )      CASE NO. 04CV-2020-_____
                                       )
BENTONVILLE SCHOOL DISTRICT,           )
JOHN DOE                               )
Defendant                              )
                                       )

### COMPLAINT

The Plaintiffs, Rodney and Jayme Baker, individually and as parents and next friends of

IB, a minor, (collectively referred to as the "Parents" or "Plaintiffs"), submit this Complaint against

Defendant, Bentonville School District (hereafter the "District"), and state and allege:

### PARTIES, JURISDICTION, AND VENUE

1.      At all times described in this Complaint and relevant thereto, IB was a student

with known disabilities attending school in the District.

2.      Parents are the parents and next friends to Plaintiff IB and bring this action on

her behalf.

3.      District is a school district organized under the laws of the State of Arkansas

and is the recipient of state government funds.

4.      Plaintiffs bring this action against the District pursuant to the Arkansas Civil

Rights Act of 1993, Ark. Code Ann. § 16-123-107(a), as a provider of public services and

recipient of government funds, for its intentional discrimination against IB, a person with a

disability, vision impairment (among others), as defined by the Act, for the District's intentional

failure to adopt and implement reasonable accommodations for IB's disability which directly

caused her damages.

**EXHIBIT**
**1**

5.      Plaintiffs bring this action pursuant to the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-105 against District for its deprivation of IB of her Constitutional right to a suitable public education as guaranteed by Article 14, Section 1 of the Arkansas Constitution.

6.      Parents bring this action seeking damages suffered by IB as a result of the District's negligence and in support of that claim, Parents bring this action seeking declaratory judgment that Ark. Code Ann. § 21-9-301 is in clear violation of the Arkansas Constitution, Article 2 Section 13, and Article 5 Sec. 32.  Further, pursuant to the Direct Action Statute, Ark. Code Ann. § 23-79-210, Parents shall bring this claim as a direct cause of action against the District's liability insurer, presently identified by the name John Doe whose identify is presently unknown, on the account of negligence or wrongful conduct by Bentonville School District.

7.      Parents bring this action pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and its federal and state implementing regulations.

8.      This Court has subject matter jurisdiction pursuant to Ark. Code Ann. § 16-123-101 *et. seq.* as well as Arkansas's Declaratory Judgment statute, Ark. Code Ann. § 16-111-101 *et. seq.*

9.      Jurisdiction is further invoked pursuant to this Court's concurrent jurisdiction to hear the Plaintiffs' federal claims under the Americans with Disabilities Act and the Rehabilitation Act, 29 U.S.C. § 794, 42 U.S.C. § 12101, et seq., and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

10.     Venue is proper in this Court due to the events giving rise to this claim having taken place in Bentonville, Benton County Arkansas and the Defendant is a resident of this judicial district.

**FACTS**

2

11.     IB attended public school at Cooper Elementary (the "School") in the Bentonville School District during her kindergarten year under the supervision of Principal Chad Mims ("Mims").

12.     On August 9, 2017, Parents and the District had their first disability accommodation meeting related to IB's disabilities as she was entering kindergarten for the 2017-2018 term.

13.     The record of that meeting notes in the "Decisions Made" section that IB presents a "safety concern – other students run into her / get in her way – close supervision during transitions / activity; Mom is available on Fridays, Wednesday after noon."

14.     The record of the same day notes that Parents clearly stated to the District that IB was "Legally Blind," "cannot distinguish male / female bathrooms," that she "smells her hands to get around," and that she has "poor depth perception."

15.     As soon as the second day of school, on August 15th, IB suffered a physical injury when her left pinky finger smashed into a bathroom door. At the time, there was no safety guidance provided as had been discussed in the meeting of August 9, 2020. This incident resulted in an emergency room visit.

16.     On August 17, the fourth day of school, IB suffered from her bottom lip being busted. No report was provided about the injury but the driver of the safety bus to which she had been assigned pursuant to that August 9th meeting, Bus No. 231, pointed the injury out to Parents after, according to IB, the injury was caused by a boy on the playground. No attempt to contact Parents had been made about this injury prior to IB getting home, nor was any attempt made after (excepting the bus driver's notation of it).

17.     During the second week of school, on August 25th, Jayme Baker witnessed IB being again injured on the playground. When she notified the School that no teacher had been watching IB as had been requested and discussed, Principal Mims admonished Ms. Baker that she could "not watch her daughter on the playground after today."

3

18.     On September 7, 2017, IB fell on the playground which resulted in an injury and a splinter having to be removed as indicated by a nurse's note.  Upon information and belief, this injury was suffered as a result of the failures to monitor IB's activity on the playground.

19.     Then on October 24, 2017, at or around 11:00 am, IB suffered a left eyebrow contusion and abrasion with moderate swelling. When asked by Ms. Baker about the incident, the Staff of the School could not tell her what happened leading to the injury. IB indicated to the Parents that a boy on the monkey bars kicked her in the face. And while a nurse's note was provided, the injury required an emergency room visit, where the injury was glued shut as stitches were too traumatic for IB.  Again, this injury is asserted to a lack of safety monitoring of IB on the playground.

20.     After that incident, the Parents had a second disability accommodation meeting on October 27th.  At that meeting, with District employees Assistant Principal Rachel Manus, and teacher Pam Sweeney (among others) in attendance, again, the School denied Parents' requests for a safety monitor be assigned to IB to reasonably accommodate her disabilities and to ensure her safety on the school grounds due to her disability.

21.     Three days later, on October 30, 2017, IB suffered a right eye laceration when she tripped on a concrete slab protruding from the playground. Upon admission from Principal Mims, the District had failed to maintain the playground and admitted later that dirt is usually filled to cover concrete slab. Again, the District denied a safety monitor as an accommodation for IB's disability after this injury.

22.     On November 3, 2017, Parents attended a third disability accommodation meeting.  Finally, after at least six known injuries and three meetings, a safety monitor was approved as an accommodation for IB's disabilities.  The accommodation designated that the assigned duty teacher would wear a designated name tag at lunch.  Also, at that meeting the school added to IB's recognized disability diagnoses "visual fatigue and sensitivity to loud noises, smells, and heat."  Finally, that meeting included the District's removal of IB from the

safety school bus despite Parents' and IB's new disability advocate's objection. Parents and IB's advocate explained the need for special transportation for IB's safety and to accommodate with her diagnosed asthma and vision impairment.

23.   On the same day, Parents sent an e-mail to School staff requesting reconsideration about removing IB from the safety bus.  The decision was not changed as a result of that email and the District removed IB from the safety bus.

24.   By November 6, 2017, Dr. Brent Silvey from MANA Pediatrics provided the School with documentation to keep IB on safety bus number 231 - though the School initially disregarded that request.

25.   On November 7, 2017, Parents sent an email to the Executive Director of Elementary Education, Tamara Gibson, about the School staff trying to take IB off the safety bus and Ms. Gibson reversed the decision.

26.   On November 17, 2017, the school recognized that IB may have cortical vision impairment and so it was coordinated with Children's Hospital to evaluate IB, which was thereafter performed.

27.   In January, 2018, it was noted by Parents that the disability accommodation – agreed by the District and Parents for a duty teacher to wear a neon green name tag such that IB could recognize him or her on the playground – was no longer being utilized.  Despite six injuries, two of which required emergency room visits, the District only actively implemented the safety monitor for less than two months of school until Parents complained.

28.   By that time, IB had begun to suffer from seizures, which she had not had before.

29.   On February 16, 2018, IB had an Electroencephalogram preformed, and on February 22, 2018 abnormal seizures were reported. Medical Providers noted the injuries at school, the lack of prior history for seizures, and that closed head injuries are a known cause of seizures.

30.    After this diagnoses, and other related events that occurred during the remainder of the year, Parents elected to utilize School Choice and enrolled IB into Pea Ridge School District for the ensuing year.

31.    There, IB excelled without significant issue until Parents and IB moved with their other family members to North Carolina.

32.    Unfortunately, IB continues to suffer the effects of seizures which are averred to be caused by and stem from the injuries suffered in 2017. She must continuously take medication to control them. Her prognosis is that these seizures shall continue perpetually along with the requirement for medication to alleviate their severity and effects.

## CAUSES OF ACTION

### COUNT I - UNLAWFUL DISCRIMINATION BASED ON A DISABILITY IN VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT, Ark. Code Ann. § 16-123-107(a)

33.    The Plaintiffs re-allege the preceding facts set forth in the Complaint.

34.    The Arkansas Civil Rights Act (the "ACRA") at Section 16-123-107(a) provides, in relevant part, that the right of an otherwise qualified person to be free from discrimination because of the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to: [t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement.

35.    The ACRA defines a "place of public resort, accommodation, assemblage, or amusement" as "'any place...either licensed or unlicensed, that supplies...services to the general public...or that is supported directly or indirectly by government funds."

36.    The District is supported directly by government funds.

37.    The District provides services to the general public.

38.    IB is a qualified person entitled to protection from discrimination because of the vision impairment, asthma, and other sensory issues she suffers.

6

39.    IB was subjected to discrimination by the District when it:

a.    Knowingly failed to accommodate her need for safety monitoring to ensure her safety in the hallways and on the playground of the School where such failures directly caused her physical injury, including but not limited to traumatic brain injury.

b.    Failed to ensure that the services contained in the accommodation plans were implemented as written.

c.    Failed to provide IB with reasonable accommodations and safeguards even after notice of the first instance of her suffering physical injury on school grounds, leading to subsequent injuries to her person. In fact, even after knowledge of her injuries, the District attempted to remove certain safeguards (safety bus) that had been provided for IB's protection up to November 6, 2017.

d.    Failed to enforce or otherwise implement policies and procedures to verify the effectiveness of any actions taken to ensure IB's safety due to her disabilities.

e.    Failed to ensure that personnel were applying appropriate modifications and practices to accommodate IB's disabilities in a manner equal with the services provided to children without disabilities.

f.    Failed to investigate, monitor, or correct the repeated failures to provide for safety accommodations for IB; and

g.    Failed to take remedial action after Parents complained that IB was suffering from injuries due to the lack of safety monitoring until no sooner than November 6, 2017.

40.    The District's failures, as identified above, departed substantially from accepted professional judgment, practices, and standards.

41.    The District's failures, as identified above, demonstrate that the District did not base its actions on accepted professional judgment, practices, and standards.

7

42.     IB was excluded from participation in, denied the benefits of, and subject to discrimination at the District on the basis of her disabilities, because the District failed to provide IB with appropriate safety accommodations and related services that she required in order to have equal access to the benefits of the District provided to children without disabilities.

43.     The District's failure to provide proper accommodations for IB's disabilities has in fact exacerbated the impact of her disabilities and caused additional damage to IB.

44.     The District was aware of IB's disabilities and need for safety monitoring and accommodations but failed to provide her with appropriate accommodations to address that need.

45.     The District had actual knowledge that IB was not being provided with appropriate safety monitoring accommodations and had frequently been made aware of the issues raised in the statement of facts herein by Parents.

46.     The District had actual knowledge that neither it nor its agents were implementing the safety monitoring accommodations which had been first requested directly by parents on August 9, 2017.

47.     The District's affirmative acts and omissions were committed with deliberate indifference to and reckless and willful disregard for IB's rights, as is evidenced by the District's possession of actual knowledge that IB required accommodations to ensure safety due to her disability while on the District's property but abjectly refused to supply the same until November 6, 2017.

48.     IB was being discriminated against based on her disability, yet the District was deliberately indifferent to the discrimination.

49.     The District's deliberate indifference to the discrimination suffered by IB constituted bad faith and gross misjudgment by the District and intentional discrimination based on IB's disabilities in that it had the capacity to provide all safety measures requested by the Parents at the first accommodation meeting on August 9, 2017 without incurring unreasonable cost, refused Parent attendance at school to assist with that process, and then for a period of two months stood idly by while IB was repeatedly injured at school due to her disabilities.

50.    The District's failures, as identified above, demonstrate discriminatory intent on the part of the District.

51.    By reason of the foregoing, IB and Parents have been damaged and are entitled to fair and reasonable compensation.

### COUNT II – VIOLATION OF IB'S CIVIL RIGHTS IN VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT, Ark. Code Ann. § 16-123-105(a)

52.    The Plaintiffs re-allege the preceding facts set forth in the Complaint.

53.    The Arkansas Civil Rights Act (the "ACRA") at Section 16-123-105 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress."

54.    The Arkansas Constitution, at Article 14, Section 1 (as amended by Amendment 53 of 1968) states: "[i]ntelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education. The specific intention of this amendment is to authorize that in addition to existing constitutional or statutory provisions the General Assembly and/or public school districts may spend public funds for the education of persons over twenty-one (21) years of age and under six (6) years of age, as may be provided by law, and no other interpretation shall be given to it."

55.    IB, as a five-year-old kindergartner, was entitled to a suitable public-school system to secure the advantages and opportunities of education.

56.    The District's failure to safeguard her at school, and failure to ensure her safety, knowing of her disabilities yet failing to provide reasonable accommodations to ensure her equal access to the school system, deprived her of that right.

57.    Specifically, the District:

a.  Knowingly failed to accommodate her need for safety monitoring to ensure her safety in the hallways and on the playground of the School where such failures directly caused her physical injury, including but not limited to traumatic brain injury.

b.  Failed to ensure that the services contained in the accommodation plans were implemented as written.

c.  Failed to provide IB with reasonable accommodations and safeguards after notice of the first instance of her suffering physical injury on school grounds, thus leading to subsequent injuries to her person.  In fact, even after knowledge of her injuries, the District attempted to remove certain safeguards (safety bus) that had been provided for IB's protection up to November 6, 2017.

d.  Failed to enforce or otherwise implement policies and procedures to verify the effectiveness of any actions taken to ensure IB's safety due to her disabilities.

e.  Failed to ensure that personnel were applying appropriate modifications and practices to accommodate IB's disabilities in a manner equal with the services provided to children without disabilities.

f.  Failed to investigate, monitor, or correct the repeated failures to provide for safety accommodations for IB; and

g.  Failed to take remedial action after Parents complained that IB was suffering from injuries due to the lack of safety monitoring until no sooner than November 6, 2017.

58.     IB was denied the benefits of a suitable public school system because the District failed to provide IB with appropriate safety accommodations that she required in order to have complete access to the benefits of the District's services.

59.     By reason of the foregoing, IB and Parents have been damaged and are entitled to fair and reasonable compensation.

### COUNT III - UNLAWFUL DISCRIMINATION BASED ON A DISABILITY IN VIOLATION OF SECTION 504 AND THE AMERICANS WITH DISABILITIES ACT

60.     The Plaintiffs re-allege the preceding facts set forth in the Complaint.

61.     Section 504 of the Rehabilitation Act ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability...be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

62.     Section 504 prohibits the exclusion of, or discrimination against, handicapped persons in federally funded programs such as public education.  Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.1, *et seq.*  Failure to provide accommodations constitutes unlawful discrimination for purposes of Section 504.

63.     Under Section 504, a "handicapped person" is defined as "any person who . . . has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3(j)(1).  The term physical or mental impairment means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or any mental or psychological disorder, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 34 C.F.R. § 104.3(j)(2)(i).  The term "major life activities" is defined as "functions

11

such as caring for one's self, performing manual tasks...seeing...breathing, learning, and working." 34 C.F.R. § 104.3(j)(2)(ii).

64.     In order to establish a violation of Section 504, a claimant must prove that: (1) he or she is "disabled" as defined by the Rehabilitation Act; (2) he or she is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal assistance; and (4) he or she was excluded from participation in, or denied the benefits of, or subject to discrimination at, the school. 29 U.S.C. § 794(a).

65.     IB is disabled for purposes of Section 504.  Specifically, IB suffers vision and respiratory impairments that substantially limit the major life activities of seeing, breathing, communication, social interaction, and academic achievement.

66.     IB is a student who, at all times relevant to this Complaint, is and was otherwise qualified to participate in, and receive equal benefits from, the District's services with appropriate accommodations and supplemental supports for purposes of Section 504.

67.     The District receives federal assistance and is therefore subject to Section 504.

68.     The Americans with Disabilities Act (the "ADA") provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.  The Eighth Circuit Court of Appeals has held that the enforcement, remedies, and rights are the same under both Title II of the ADA and Section 504 of the Rehabilitation Act. *See J.S. v. East End Sch. Dist.*, No. 4:05-CV-01599, 2007 WL 1029559, at *9 (E.D. Ark. Apr. 3, 2007) (citing *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000)).

69.     The ADA defines a "public entity" as "any State or local government . . . any department, agency, special purpose district, or other instrumentality of a State or States or local government. 42 U.S.C. § 12131(1)(A)-(B).

70.     The ADA defines a "qualified individual with a disability" as "any individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

71.     The regulations implementing Title II of the ADA require that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with a disability." 28 C.F.R. § 35.130(d).

72.     The regulations implementing Title II of the ADA affirmatively require public entities to modify their practices, policies, and procedures as necessary to avoid discriminating against individuals with disabilities. 28 C.F.R. § 35.130(b)(7).

73.     In order to establish a violation of the ADA, a claimant must prove that: (1) he or she is a "qualified individual with a disability" as defined by the ADA; (2) the school or board of education is a "public entity"; and (3) he or she was excluded from participation in or denied the benefits of the services, programs, or activities of the public entity or subject to discrimination by such entity.

74.     IB is a qualified individual with a disability as defined by the ADA.  Specifically, IB suffers vision and respiratory impairments due to the Diagnoses described above. As a result of these impairments, and with or without reasonable modifications to barriers, or the provision of auxiliary aids and services, IB meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the District and the Arkansas Department of Education.

75.     The District is a political entity and subdivision of the State and is subject to Title II of the ADA.

76.     IB was excluded from participation in, denied the benefits of, and subject to discrimination at, the District, in violation of Section 504 and the ADA because the District:

      a. Knowingly failed to accommodate her need for safety monitoring to ensure her safety

13

in the hallways and on the playground of the School where such failures directly caused her physical injury, including but not limited to traumatic brain injury.

b.  Failed to ensure that the services contained in the accommodation plans were implemented as written.

c.  Failed to provide IB with reasonable accommodations and safeguards after notice of the first instance of her suffering physical injury on school grounds, thus leading to subsequent injuries to her person.  In fact, even after knowledge of her injuries, the District attempted to remove certain safeguards (safety bus) that had been provided for IB's protection up to November 6, 2017.

d.  Failed to enforce or otherwise implement policies and procedures to verify the effectiveness of any actions taken to ensure IB's safety due to her disabilities.

e.  Failed to ensure that personnel were applying appropriate modifications and practices to accommodate IB's disabilities in a manner equal with the services provided to children without disabilities.

f.  Failed to investigate, monitor, or correct the repeated failures to provide for safety accommodations for IB; and

g.  Failed to take remedial action after Parents complained that IB was suffering from injuries due to the lack of safety monitoring until no sooner than November 6, 2017.

77.    The District's failures, as identified above, departed substantially from accepted professional judgment, practices, and standards.

78.    The District's failures, as identified above, demonstrate that the District did not base its actions on accepted professional judgment, practices, and standards.

79.    IB was excluded from participation in, denied the benefits of, and subjected to discrimination at the District on the basis of her disabilities, because the District failed to provide IB

14

with appropriate safety accommodations and related services that she required in order to have equal access to the benefits of the District to that provided to children without disabilities.

80.    The District's failure to provide proper accommodations for IB's disabilities has exacerbated the impact of her disabilities and in fact caused additional damage to IB.

81.    The District was aware of IB's disabilities and need for safety monitoring and accommodation but failed to provide her with an appropriate accommodation to address that need.

82.    The District had actual knowledge that IB was not being provided with appropriate safety monitoring accommodations and was aware of the issues raised in the statement of facts herein.

83.    The District had actual knowledge that neither it nor its agents were implementing the safety monitoring accommodations which had been first requested directly by parents on August 9, 2017.

84.    The District's affirmative acts and omissions were committed with deliberate indifference to and reckless and willful disregard for IB's rights, as is evidenced by the District's possession of actual knowledge that IB required a safety monitoring accommodation while on the District's property but abjectly refused to supply the same until November 6, 2017.

85.    IB was being discriminated against based on her disability, yet the District was deliberately indifferent to the discrimination.

86.    The District's deliberate indifference to the discrimination suffered by IB constituted bad faith and gross misjudgment by the District and intentional discrimination based on IB's disabilities in that it had  the capacity to provide all safety measures requested by the Parents at the first accommodation meeting on August 9, 2017 without unreasonable cost needing to be incurred, refused Parents' attendance at school to assist with that process, and then for a period of two months stood idly by while IB was repeatedly injured at school due to her disabilities.

87.    The District's many failures, as identified above, demonstrate discriminatory intent on the part of the District.

88.    As victims of discrimination based upon disability, IB and Parents have been damaged and are entitled to fair and reasonable compensation.

## COUNT IV – NEGLIGENCE AGAINST DISTRICT & DIRECT ACTION AGAINST INSURER

89.    The Plaintiffs re-allege the preceding facts set forth in the Complaint.

90.    District is a school district which, except for the amounts of liability insurance maintained by them, are statutorily declared to be immune from tort liability.  However, upon information and belief, at the times of the events giving rise to the causes stated herein, District maintained liability insurance.  As stated further herein, the constitutionality of such immunity is disputed.

91.    To the extent that the statutory tort immunity be held constitutional, the Plaintiffs plead the facts giving rise to negligence against both the District and its insurer, the identity of which is unknown at this time, but the joinder of which will be made upon verification of its identity.

92.    Ark. Code Ann. § 21-9-301 states that "all...school districts...of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance."

93.    According to Ark. Code Ann. § 21-9-301, District is liable, through its insurance carrier, for tortious acts committed to the extent it is covered by liability insurance.

94.    Pursuant to Ark. Code Ann. § 23-79-210(a)(1), "[w]hen liability insurance is carried by any...school district...and if any person...suffers injury or damage to person or property on account of the negligence or wrongful conduct of the organization, association, municipality, or subdivision, its servants, agents, or employees acting within the scope of their employment or agency, then the person...so injured or damaged shall have a direct cause of action against the

insurer with which the liability insurance is carried to the extent of the amounts provided for in the insurance policy as would ordinarily be paid under the terms of the policy."[1]

95.    Under Section 29-79-210(a)(3), "[t]he insurer shall be directly liable to the injured person…for damages to the extent of the coverage in the liability insurance policy, and the plaintiff may proceed directly against the insurer regardless of the fact that the actual tortfeasor may not be sued under the laws of the state."[2]

96.    Furthermore, pursuant to Section 29-79-210(c)(2), "[t]he substance of this section [the direct-action statute] shall by operation of law be a part of any liability insurance policy so carried, notwithstanding the terms of the policy itself, and any limitation in any policy restricting the right to recover to a judgment's first being obtained against a tortfeasor shall be void."[3]

97.    Therefore, under Ark. Code Ann. § 29-79-210, the District, through its insurer, is liable to Plaintiffs in a direct action against the insurer for the damages caused by District's negligent acts or omissions, regardless of the exclusions or other inconsistent terms set forth in the policy, to the extent of the policy amounts provided for in the insurance agreement.

98.    Upon information and belief, the Insurance Policy is expected to obligate the insurer to pay those sums that an Insured becomes legally obligated to pay as damages because

---

[1] "Because direct-action statutes are remedial in nature, [courts] liberally construe them for the benefit of the injured parties and to effectuate the intended purposes." *Henry v. Cont'l Cas. Co.*, 2011 Ark. 224, 10, 381 S.W.3d 802, 808 (2011) (citing *Rogers v. Tudor Ins. Co.*, 325 Ark. 226, 227, 925 S.W.2d 395 (1996)). "The manifest purpose of the 'direct action statute' … is to protect the rights of the injured and not the rights of the insurer or the insured." *S. Farm Bureau Cas. Ins. Co. v. Robinson*, 236 Ark. 268, 271, 365 S.W.2d 454, 457 (1963).

[2] "The direct action statute…provides a new or substitute remedy for the underlying claim of negligence in cases where the plaintiff cannot recover directly from a negligent [immune entity]." *Archer v. Sisters of Mercy Health Sys., Inc.*, 375 Ark. 523, 530, 294 S.W.3d 414, 418 (2009).

[3] "…the [direct action statute] says that the Statute is made a part of the policy and prevails over any language or fine print in the policy. *Aetna Cas. & Sur. Co. v. Brashears*, 226 Ark. 1017, 1021, 297 S.W.2d 662, 665 (1956). In that case, the Supreme Court held the insurance company liable despite exclusions in the policy that the insurance company asserted should prevent the appellee from recovering under the policy. *Id.* at 1019-22, 297 S.W.2d at 663-65.

of a wrongful act (regardless of whether or not such allegations prove to be groundless, false or fraudulent) arising out of the discharge of duties by or on behalf of the District.

99.    In accordance with Ark. Code Ann. § 6-15-1001 *et. seq.* the District had a duty to enforce school district policies to ensure the safety of every student during school hours.

100.    Specifically, pursuant to Ark. Code Ann. § 6-15-1005:  Arkansas schools will have safe and functional facilities, [t]he school climate will promote student achievement, [e]very school and school district will enforce school district policies to ensure the safety of every student during school hours at school-sponsored activities.

101.    The District breached its duty of care to Plaintiffs when it failed to enforce school district policies to ensure the safety of IB, namely on at least six instances where IB was injured due to the lack of safety monitoring provided by the District and/or the lack of maintenance of the School playground.

102.    District, by its failures to enforce such policies or provide protection or intervention for the Plaintiffs, breached its duty to provide IB with a safe school.

103.    For the same reasons, District breached its duty to Plaintiffs by failing to monitor the safety of IB when on the playground.  Specifically, District breached its duty to Plaintiffs by failing to protect her and ensure her safety after the first alleged incident of injury the first week of school on August 15, 2017 through November 6, 2017.

104.    The District's breaches of its duties are the proximate cause of harm to Plaintiffs, including that for physical sickness and injury to her person as well as physical manifestations of mental illness, among other damages which shall be proven at trial.

### COUNT V – DECLARATORY JUDGMENT AS TO THE CONSTITUTIONALITY OF ARK. CODE ANN. § 21-9-301

105.    The Plaintiffs re-allege the preceding facts set forth in the Complaint.

106.    In accordance with Arkansas's declaratory judgment statute, Ark. Code Ann. §§ 16-111-101 *et. seq.*, Plaintiffs request the Court to issue a declaration that the tort immunity

statute, Ark. Code Ann. § 21-9-301, does not apply in this case due to the liability insurance mentioned in the above paragraphs, or in the alternative, that the statute is unconstitutional under the Arkansas Constitution.

107.    The Arkansas Supreme Court has recognized that every act carries a strong presumption of constitutionality. *City of Cave Springs v. City of Rogers*, 343 Ark. 652, 658, 37 S.W.3d 607, 611 (2001). "An act will be struck down only when there is a clear incompatibility between the act and the constitution." *Id.* at 659, 37 S.W.3d at 611. "In construing a statute, [the Court] will presume that the General Assembly, in enacting it, possessed the full knowledge of the constitutional scope of its powers, full knowledge of prior legislation on the same subject, and full knowledge of judicial decisions under preexisting law." *Rodney D. Holloway, Inc. v. Pine Ridge Addition Residential Prop. Owners*, 332 Ark. 450, 453, 966 S.W.2d 241, 243 (1998). "Where the language is plain and unambiguous, [the Court] determines legislative intent from the ordinary meaning of the language used." *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, *5, 308 S.W.3d 135, 139.

108.    Ark. Code Ann. § 21-9-301 clearly and unmistakably conflicts with Article 2, Section 13 of the Arkansas Constitution, which states: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character; he ought to obtain justice freely, and without purchase; completely, and without denial; promptly and without delay; conformably to the laws."

109.    "The General Assembly does not have the power to override a constitutional provision." *Bd. of Trustees of Univ. of Arkansas v. Andrews*, 2018 Ark. 12, *11, 535 S.W.3d 616, 622.[4]

---

[4] The Plaintiff recognizes that Ark. Code Ann. § 21-9-301 was previously held constitutional under Art. 2, § 13 by the Arkansas Supreme Court in *White v. Newport*, 933 S.W.2d 800, 326 Ark. 667 (1996). Further, and more importantly, it is crucial to note that the proposition for which *Andrews* stands is that the legislature does not have the power to override a constitutional provision regardless of the reason it desires to do so (which would include public policy), and thus *Andrews* has overruled *White v. Newport*.

110.    Despite prior decisions holding the statute to be constitutional, § 21-9-301 is a clear attempt by the legislature to override Art. 2, § 13 of the Arkansas Constitution by preventing persons injured by the statutorily immune entities from receiving a remedy for the injuries caused by the immune entities.  Parties injured by these immune entities cannot seek redress from the State Claims Commission like they could if the wrongdoer was an arm of the State of Arkansas and are thus without any avenue for redress.

111.    Ark. Code Ann. § 21-9-301 is also incompatible with Article 5, §32 of the Arkansas Constitution.  Under Art. 5, § 32, the General Assembly is prohibited from enacting laws limiting the amount to be recovered for injuries to persons in non-worker's compensation cases.

112.    The public policy of the Arkansas Constitution dictates that these immune entities should not be allowed to commit torts and other wrongs with impunity in the absence of liability insurance, leaving their injured parties without any means to obtain a remedy for their injuries.

113.    In compliance with Ark. Code Ann. § 16-111-101 *et. seq.* the Arkansas Attorney General is being notified of this request to declare an Arkansas statute unconstitutional.

### RESERVATION OF RIGHTS

114.    Plaintiffs reserve the right to assert additional claims in this matter and to amend this Complaint as may be appropriate.

115.    Parents demand a trial by jury on all issues raised above.

### RELIEF REQUESTED

116.    The District had a duty to IB that arose under the laws of Arkansas, Section 504, and the ADA to provide appropriate accommodations for her disabilities.  The District had an obligation to use reasonable care to monitor and ensure her safety at school.  The District breached these duties, thus violating IB's rights under Arkansas law, Section 504, and the ADA.

117.    The losses, damages, and injuries to IB and Parents, the value of which is claimed to be in excess of the amount required for Federal Diversity Jurisdiction, are the direct and proximate

results of the District's breaches of a duty to provide accommodations for her disabilities and failure to supervise her to ensure her safety as set forth herein.

WHEREFORE, the Plaintiffs respectfully request that this Court:

h.  Assume jurisdiction over this action;

i.  Award compensatory damages pursuant to the Arkansas Civil Rights Act, Arkansas common law negligence, Section 504 and the ADA;

j.  Order the District to pay the Parents' reasonable attorneys' fees and related costs;

k.  Declare the District's actions and omissions to be violative of the Arkansas Civil Rights Act, Section 504, and the ADA; and

l.  Grant such other relief as this Court deems proper.

Respectfully submitted,

**Rodney and Jayme Baker, Plaintiffs**

/s/George M. Rozzell IV, ABA#2008032
Miller, Butler, Schneider, Pawlik, Rozzell
112 W. Center St, Ste. 555, Fayetteville, AR 72701
224 S. 2nd St., Rogers, Arkansas 72756
Telephone: 479-621-0006
Facsimile: 479-631-6890
Email: grozzell@arkattorneys.com

## IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS
## 19TH WEST CIRCUIT DIVISION 2

### BAKER ETAL V BENTONVILLE SCHOOL DISTRICT

04CV-20-1703

### SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

BENTONVILLE SCHOOL DISTRICT
500 Tiger Blvd
Bentonville, AR 72712

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

George M. Rozzell, IV
112 W. Center St. Ste 555
Fayetteville, AR 72701

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

BRENDA DESHIELDS, CIRCUIT CLERK
CIRCUIT COURT OF BENTON COUNTY
102 NORTHEAST A STREET
BENTONVILLE, AR 72712

Deputy Clerk Tani D Ross, DC

Date: 08/07/2020

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 08/07/2020

No. 04CV-20-1703 This summons is for BENTONVILLE SCHOOL DISTRICT (name of Defendant).

### PROOF OF SERVICE

☐ On _____ [date] I personally delivered the summons and complaint to the individual
at _____ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on _____
[date] I left the summons and complaint in the close proximity of the defendant by
_____ [describe how the
summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On _____ [date] I left the summons and complaint with _____, a
member of the defendant's family at least 18 years of age, at _____
[address], a place where the defendant resides; or

☐ On _____ [date] I delivered the summons and complaint to _____
[name of individual], an agent authorized by appointment or by law to receive service of summons on
behalf of _____ [name of defendant]; or

☐ On _____ [date] at _____ [address], where the
defendant maintains and office or other fixed location for the conduct of business, during normal
working hours I left the summons and complaint with
_____

[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons
and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as
shown by the attached signed return receipt.

☐ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the
summons and complaint by first-class mail to the defendant together with two copies of a notice and
acknowledgment and received the attached notice and acknowledgment form within twenty days after
the date of mailing.

☐ Other [specify]: _____
_____

☐ I was unable to execute service because: _____
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

                               By: _____
                               [Signature of server]

                               _____
                               [Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
                               [Signature of server]

                               _____
                               [Printed name]

Address: _____
         _____

Phone: _____

Subscribed and sworn to before me this date: _____

                               _____
                               Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____
_____