UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RODNEY BAKER and JAYME
BAKER, each individually and as
next friends of IB, a minor                                                    PLAINTIFFS

v.                                      No. 5:20-CV-05207

BENTONVILLE SCHOOL DISTRICT                                                    DEFENDANT

**OPINION AND ORDER**

Before the Court is Defendant Bentonville School District's (the "District") motion (Doc. 29) for summary judgment, statement of facts (Doc. 31), and brief in support (Doc. 32).[1] Plaintiffs filed a response (Doc. 34) and statement of facts (Doc. 33) in opposition, and various exhibits under seal (Doc. 33). The District filed a reply (Doc. 35). For the reasons set forth below, the motion will be GRANTED.

**I.     Background**

Plaintiffs Rodney Baker and Jayme Baker bring this action on behalf of their minor child IB, hereinafter referred to as "Student." Student was born in 2012 and suffered vision problems from an early age. From October 2015 to November 2019, Dr. Brita Rook, Dr. William Yoos, and Dr. Paul Henry treated Student's vision. Dr. Rook, a pediatric ophthalmologist at Arkansas Children's Hospital ("ACH") saw Student from October 2015 to June 2017. By October 2015, Student was diagnosed with bilateral hyperopia and accommodative esotropia. Bilateral hyperopia caused farsightedness in both eyes. Student's vision was the poorest in her left eye. Accommodative esotropia caused Student's eyes to "cross inward toward the nose because of the

---

[1] The District also filed various exhibits (Doc. 30) under seal pursuant to a protective order (Doc. 26).

1

farsightedness in her eyes." (Doc. 31, p. 2, ¶ 6).  Student was also diagnosed with amblyopia which meant both of her eyes did not look at the same place, at the same time.  Student had corrective lenses for both near and far sightedness which helped reduce the eye crossing.  Dr. Rook believed Student's eye conditions would improve with treatment, including patching[2] and corrective lenses, however, this was not certain.

Student had at least twelve visual acuity tests from May 6, 2015 to September 24, 2018.  These tests determined the visual acuity in Student's left and right eyes.  Normal vision is typically a visual acuity "stronger than 20/70 in the better-seeing eye with correction." (Doc. 31, p. 2, ¶ 12).  A person is considered legally blind with visual acuity of "20/200 or less in the better-seeing eye with correction."  *Id.*  A person with visual acuity of 20/40, 20/50, and 20/70 is typically able to read and "visual acuity of 20/50 or stronger in the better seeing eye with correction is considered good enough to drive."  *Id.* at p. 3, ¶¶ 12-13.  Because children's cooperation during visual acuity tests varies, providers often look at multiple exams over a period of time to accurately determine a child's visual acuity.  Throughout Student's twelve visual acuity tests, Student's visual acuity in her left eye ranged from a 20/30 to a 20/200, and the visual acuity in her right eye ranged from a 20/40 to a 20/70.

On April 25, 2017, Dr. Rook performed a strabismus operation on Student and Ms. Baker indicated that Student's visual acuity appeared better after the surgery.  On June 16, 2017, the District received an Educational Services for the Visually Impaired ("ESVI") form from ACH which listed Student's visual acuity as 20/50 in the right eye and 20/150 in her left eye with correction.  The ESVI form also reflected Student as having normal vision and stated Student "may

---

[2] Patching required Student to place a cover over her right eye to encourage better vision in her left eye.  (Doc. 33-2, p. 18, ¶¶ 19-23).

benefit from a 504 plan." (Doc. 30-17, p. 16). Student had an eye exam on September 22, 2017, and had visual acuity of 20/70 in her right eye, 20/200 in her left eye, and 20/70 using both eyes. The September 22 visual acuity exam results were the worst results Student had from 2015 to 2018. On January 31, 2018, Student's visual acuity results were 20/50 visual acuity in her right eye and a 20/70 visual acuity in her left eye. At no point did Student's visual acuity drop to 20/200 or less in the better-seeing eye with correction, and no medical professional diagnosed Student as legally blind.

Student was an enrolled student in the District, and her kindergarten year at Cooper Elementary School started on August 15, 2017. Prior to the start of school, in August 2017, Ms. Baker contacted Cooper Elementary to discuss a 504 plan for Student. On August 9, 2017, Ms. Baker attended a 504 conference (the "August 9 conference") with Cooper Elementary Assistant Principal Rachel Manus and the school nurse. At the August 9 conference, Ms. Baker stated Student was legally blind, could not distinguish gendered bathrooms, and was very accident prone. The same day, a 504 Plan was created (the "First 504 Plan") and signed by Ms. Baker, Assistant Principal Manus, and Student's kindergarten teacher Pamela Sweeney. The First 504 Plan stated student had a diagnosis of vision impairment and listed the following accommodations: "large print, close supervision during transition/activity, [b]uddy for errands/restroom, [h]old hand of teacher on elevator or stairs, and (s)pecialized transportation." (Doc. 30-17, p. 74). Specialized transportation referred to the safety bus. Ms. Baker agreed with the First 504 Plan accommodations. Cooper Elementary's 504 coordinator met with all teachers responsible for Student, informed them of the First 504 Plan accommodations and Student's vision impairment, and provided the teachers a copy of the First 504 Plan.

The First 504 Plan was in place on Student's first day of kindergarten. Although

kindergarteners typically travelled as a group during transitions to other areas of the school, "anytime [Student's class] transitioned, [Student] would be by [Ms. Sweeney's] side and she wouldn't go anywhere without [Ms. Sweeney] present." (Doc. 33-9, p. 4). Student was accompanied in the hallways, either by a staff member or a "buddy,"[3] and "had a hand when going up the stairs." (Doc. 33-8, p. 18). Further, Student "had someone within close proximity to her during transitions and during activity time." (Doc. 33-10, p. 5). Principal Chad Mims defined "close proximity" as "[b]eing able to have eyes on [Student]." *Id.* Student's class went to the restroom in groups with Ms. Sweeney present. At recess, Student would tell Ms. Sweeney where she wanted to play and Ms. Sweeney would "keep her eyes on [Student]." (Doc. 33-9, pp. 4-5). Because Student liked to play in multiple areas during recess, Ms. Sweeney created "a vicinity where [Student] could play and [Ms. Sweeney] could keep [her] eyes on [Student]." *Id.* Ms. Sweeney shared Student's safety strategy with other kindergarten teachers, and the District instructed all kindergarteners on safe play at recess.

In September 2017, the District's vision consultants, Tamara McNabb and Misty Cates, performed a Functional Vision Assessment ("FVA") for Student. The FVA included a review of Student's medical records, eye reports, and school records. The vision consultants also discussed the eye reports with Student's medical providers and discussed Student's vision issues with Ms. Sweeney, the physical education teacher, and Principal Mims. Student's functional visual capabilities, including depth perception and ability to navigate stairs and the playground, were evaluated through classroom and activity observations. The FVA noted Student "demonstrated no concerns with depth perception and [] did not limit herself on the playground equipment." *Id.* at 5. Also, Student "demonstrated no trouble remembering routes at school[,] . . . exhibited no problems

---

[3] A "buddy" was typically a classroom job for a student. (Doc. 33-10, p. 11).

with curbs, stairs and other drop-offs[,] . . . [and] was observed walking efficiently around the classroom, library, cafeteria, school hallways and stairs." *Id.* The FVA determined Student qualified as a student with low vision and Student was added to the ESVI caseload to receive vision services from Ms. Cates for sixty minutes per week. *Id.* at 6. The FVA also recommended Student sit within five to six feet of the board, receive 18-point font size materials, practice self-advocacy, utilize organizational skills, and use safety precautions when in physical education class ("PE") or unfamiliar areas.

On October 27, 2017, Ms. Baker met with school officials and Student's 504 plan was updated (the "Second 504 Plan"). The Second 504 Plan enacted the following accommodations: (1) preferential seating (5-6 feet from instruction); (2) encouragement of Student's self-advocacy; (3) keeping desk/workspace organized and clutter free; (4) 18 pt font on materials provided to Student; (5) safety precautions for unfamiliar areas and in PE class; (6) access to a magnifier for library books; and (7) vision services for sixty minutes per week. The Second 504 Plan also removed the specialized transportation accommodation because of Student's visual acuity reports and the FVA results. Ms. Baker signed the Second 504 Plan. During the first three months of school, the District had multiple meetings and communications with Student's parents regarding Student's accommodations.

From August 15, 2017, to October 30, 2017, Student was injured six times at school. On August 15, Student's finger was stuck in the door of a restroom. Ms. Baker took Student to the emergency room. Medical records reflect Student's finger was not broken and the injury was treated with an ice pack, antibiotic ointment, and a bandage. On August 17, Student's bottom lip was busted by another student. Ms. Baker did not seek medical treatment for Student's busted lip.

5

On August 25, Student was injured[4] when another student ran up the slide while Student was using the slide. No medical treatment was sought. On September 7, Student was injured on the playground when she received a splinter. The school nurse removed the splinter and no further medical treatment was sought. On October 24, Student was kicked in the face by another student on the monkey bars. Ms. Baker did not seek medical treatment for Student but the school nurse's assessment stated Student suffered "contusion/abrasion to [left] eyebrow [with] moderate swelling" and Student's glasses broke. (Doc. 30-17, p. 61). The school nurse cleaned Student's wound, applied antibiotic ointment and/or a Band-Aid, and provided an ice pack. *Id.* On October 30, Student tripped on a concrete slab during recess and had lacerations to her right eyebrow and left knee. Ms. Baker took Student to the emergency room and her wound was cleaned and closed with a wound glue. 504 meetings were held with responsible staff after these injuries.

On November 3, Ms. Baker requested Student's pediatrician, Dr. Brently Silvey, write a doctor's note that represented Student needed to ride the safety bus because of vision, asthma, and anxiety. Dr. Silvey initially declined to provide the letter but based on Ms. Baker's representations that Student received a safety paraprofessional at school, Dr. Silvey provided a letter dated November 6, 2017, requesting student ride the safety bus. Student did not have a safety paraprofessional.[5] Student was placed back on the safety bus seven days later because of her asthma.

On November 7, Ms. Baker, the District's 504 coordinator Trish Wood, Principal Mims, Assistant Principal Manus, and Ms. Sweeney attended a 504 meeting. Stephanie Lambert,

---

[4] Plaintiff provided no evidence of what type of injury Student sustained on this date.
[5] Ms. Baker argues Student did have a personal aide because of the color-coded lanyard system implemented, however, the lanyards were only worn by duty teachers at recess and there is no evidence that Student was assigned a personal aide.

6

Student's advocate, also attended the meeting via telephone. At this meeting a third 504 plan was enacted (the "Third 504 Plan"). The Third 504 Plan stated Student would be referred for comprehensive special education testing and stated duty teachers would be trained and informed on Student's vision limitations and the duty teacher would wear a color-coded lanyard to ensure Student could identify the teacher at recess. Student did not have any injuries at school after the Third 504 Plan was enacted.

On November 17, Ms. Baker attended a special education referral conference with school officials. Ms. Sweeney told Ms. Baker and school officials that Student was doing well academically, however, Ms. Baker believed Student needed more educational support. Student was also evaluated for physical therapy in January 2018 and the evaluation determined Student did not need physical therapy services. On February 9, 2018, Ms. Baker met with school officials and it was decided that Student's 504 Plan would be changed to an Individualized Education Program ("IEP"). During the IEP conference Ms. Baker said Student was to start dilation drops and she was worried that Student would need more assistance because the drops would make Student's eyes blurry. An IEP was enacted on February 9 and the IEP accommodations were identical to the ones in the Third 504 Plan. Student's IEP reflected that Student had "mastered all grade level skills assessed in both literacy and math." (Doc. 30-17, p. 31).

In November 2017, Student began to experience seizures which Ms. Baker described as "starting spells". On February 5, 2018, Student was seen by neurologist Dr. Jhablall Balmakund. Dr. Balmakund ordered an Electroencephalogram ("EEG") which "helps in the diagnosis of seizures." (Doc. 30-6, p. 8). The EEG was administered on February 16 and was "interpreted as abnormal because of 'diffuse sharps suggestive of diffuse cerebral irritation, and may increase the child's risk of seizures during awake and sleep state.'" (Doc. 33, p. 38, ¶ 107). However, there

was no indication a seizure was captured on the EEG. Dr. Balmakund diagnosed Student with epilepsy on August 7, 2018, based on the EEG results and Ms. Baker's reports of seizure activity. In February 2019 Student had another EEG, which Dr. Balmakund interpreted as normal. On March 1, 2019, Dr. Balmakund ordered a "long-term video EEG overnight study" and Student was taken off anti-seizure medication for the EEG study. *Id.* at pp. 39-40, ¶ 113. After the March 2019 EEG, an MRI was conducted on Student's brain and the results were normal and did not show indication that there was a past traumatic brain injury. Except for Student's abnormal February 16 EEG and Ms. Baker's reports of Student's seizures, there was no objective finding that Student has seizures.

Mr. and Ms. Baker allege Student's seizures are a result of Student's injuries sustained at Cooper Elementary. At the end of the 2017-2018 school year, Mr. and Ms. Baker enrolled Student in the Pea Ridge School District for the 2018-2019 school year. Mr. and Ms. Baker allege Plaintiff excelled at Pea Ridge School District, and the family then moved to North Carolina.

On August 7, 2020, Plaintiffs filed this action against the District in the Circuit Court of Benton County, Arkansas. The complaint alleges the District failed to provide reasonable accommodations to Student in violation of the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. §§ 16-123-105 & 107, Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. The complaint also asserts claims for negligence and declaratory judgment. The District filed a motion for summary judgment and argues it is entitled to summary judgment because Plaintiffs cannot show the District acted in bad faith or with gross misjudgment. The District further argues Plaintiffs are not entitled to compensatory damages for disability discrimination claims, Plaintiffs are not entitled to damages related to traumatic brain injury or seizures, the District provided

appropriate accommodations, and Plaintiffs cannot assert a claim of negligence against the District.  Plaintiffs argue they have met their burden on all claims and the case should proceed to trial.

## II.     Legal Standard

On a motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party and grants all reasonable factual inferences in the nonmovant's favor, and only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016).  The nonmovant may not rely only on allegations in the pleadings, but must identify specific and supported facts that will raise a genuine and material issue for trial.  *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012) (quoting *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997)).  Facts are material when they can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  "While the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Haggenmiller*, 837 F.3d at 884 (quotations omitted).

## III.    Analysis

### a.  Disability Discrimination

The District argues summary judgment is appropriate on Plaintiffs' claims under Title II of the ADA, Section 504 Rehabilitation Act, and the ACRA because no reasonable jury could

9

conclude the District acted in bad faith or with gross misjudgment. "Title II of the ADA prohibits public entities, including public schools from excluding qualified individuals with disabilities from participation in or benefits from that entity's services, programs, or activities." *B.M. ex. rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013) (citing 42 U.S.C. § 12132). Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* (internal quotations and citation omitted) (alterations adopted). Title II of the ADA and § 504 of the Rehabilitation Act have the same enforcement, remedies, and rights. *Id.* To prevail on an ADA and § 504 claim, Plaintiffs must demonstrate: Student (1) is a qualified individual with a disability; (2) she was denied the benefits of a program or activity of a public entity which receives federal funds; and (3) she was discriminated against based on her disability. *See Layton v. Elder*, 143 F.3d 469, 479 (8th Cir. 1998). Because a disability claim under ACRA is analyzed "using the same principles employed in analyzing claims under the [ADA]," Plaintiffs' ACRA, ADA, and § 504 claims are analyzed together. *See Duty v. Norton-Alcoa Proppants*, 293 F.3d 481 (8th Cir. 2002).

"Where alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that the school officials acted in bad faith or with gross misjudgment." *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 876 (8th Cir. 2020) (citing *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000)). To prove bad faith or gross misjudgment, "a plaintiff must show that the defendant's conduct departed substantially from accepted professional judgment, practice or standards so as to demonstrate that the persons responsible actually did not base the decision on such a judgment." *Id.* (internal quotations and

citation omitted).  The bad faith or gross misjudgment is more than "mere non-compliance with the applicable federal statutes. . . . The non-compliance must deviate so substantially from accepted professional judgment, practice or standards as to demonstrate that the defendant acted with wrongful intent." *Id.* (citing *B.M. ex rel. Miller*, 732 F.3d at 887) (internal quotations omitted).

The District argues Plaintiffs cannot establish bad faith or gross misjudgment because the District enacted a 504 plan, provided and implemented accommodations, and Plaintiffs have not offered proof of a substantial departure from accepted practices and standards.[6]  Plaintiffs argue the following "material failures" demonstrate the District's bad faith or gross misjudgment: (1) Student's injuries at school; (2) failure to ensure accommodations were implemented; (3) failure to provide Student with reasonable accommodations after her first injury and removal from safety bus; (4) failure to enforce or implement policies and procedures to ensure Student's safety; (5) failure to ensure personal applied appropriate accommodations; (6) failure to investigate, monitor, or correct repeated failures to provided safety accommodations; and (7) failure to take remedial action regarding Student's injuries prior to November 6, 2017.  The Court disagrees.

Student's First 504 Plan was enacted on August 9, 2017, prior to the first day of school. The First 504 Plan created the following accommodations for Student: "large print, close supervision during transition/activity, [b]uddy for errands/restroom, [h]old hand of teacher or elevator on stairs, and (s)pecialized transportation." (Doc. 30-17, p. 74).  Ms. Baker agreed to the accommodations and it is undisputed that Cooper Elementary's 504 coordinator "met with Student's kindergarten teacher and all other teachers who would have been responsible for Student's safety, including her PE teacher and recess teachers, and informed them of Student's

---

[6] For the purposes of the motion for summary judgment, neither party disputes that Student was disabled.

11

vision issues, Student's accommodation plan, and the need to keep a close eye on Student at all times." (Doc. 33, p. 16, ¶ 43). Student suffered four injuries between August 15 and September 7: a finger stuck in a door, a busted lip, a splinter, and an unidentified injury from an incident on a slide. Student's most serious injuries occurred on October 24 (contusion/abrasion to left eyebrow with moderate swelling) and October 30 (lacerations to her right eyebrow and left knee). Plaintiffs argue these injuries demonstrate Student's accommodations were not followed and the District's failure to update Student's 504 plan following these injuries is a substantial deviation from accepted practices.

However, Plaintiffs admitted that "Student was by Ms. Sweeney during transitions," "Ms. Sweeney helped Student navigate the stairs and unfamiliar areas," "Student had someone within 'close proximity'" during transitions and activity time (including recess), Student's classroom went to restroom in groups, and "Student was supposed to tell Ms. Sweeney where she wanted to play" at recess. (Doc. 33, pp. 17-18). Further, Student's 504 Plan was changed three times, and Ms. Baker approved the accommodations each time. The Third 504 Plan was enacted after Student's last injury and included an accommodation for a recess duty teacher to wear a colored lanyard so Student could easily identify the duty teacher responsible for watching her. Plaintiffs admit Student sustained no physical injuries after the Third 504 Plan. The District also evaluated Student for physical therapy and special education and held a special education conference. Finally, on February 9, 2018, school officials changed Student's Third 504 Plan to an IEP plan because of Ms. Baker's concern with dilation drops. The IEP plan was identical to the Third 504 Plan. Evaluating the facts in a light most favorable to Plaintiffs, no reasonable juror could find that any staff member's conduct departed substantially from accepted professional judgment, practice, or standards so as to demonstrate that the persons responsible acted in bad faith or gross

misjudgment.

Plaintiffs dedicate a considerable amount of their briefing to arguing the District acted in bad faith or with gross misjudgment because the District did not adopt all of Ms. Baker's accommodation requests, specifically, Ms. Baker's requests that Student ride the safety bus and have a one-on-one aide. The First 504 Plan included safety bus transportation for Student. However, because of Student's FVA results she was removed from the safety bus on Friday, October 27, 2017. Seven days later, Student was placed back on the safety bus, not because of her vision issues, but instead because of her asthma. Ms. Baker's request for a one-on-one aid for Student was denied because no medical records diagnosed Student as legally blind, and the District only provided one-on-one aids for legally blind students. Although Student was removed for a short time from the safety bus and not given a one-on-one aide, Plaintiffs have provided no compelling argument why these decisions departed substantially from accepted professional judgment, practice, or standards such that the persons responsible acted in bad faith or gross misjudgment. Plaintiffs' disability discrimination claims will be dismissed with prejudice.

**b. Deprivation of Civil Rights**

The District argues Plaintiff's ACRA claim for deprivation of Student's constitutional rights pursuant to Ark. Code Ann. § 16-123-105(a) should be dismissed because Student received an adequate and equal education. Article 14, Section 1 of the Arkansas Constitution provides the "State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education." Therefore, "the State has an absolute duty under [the Arkansas Constitution] to provide an adequate education to each school child, as well as an equal education to each school child." *Walker v. Ark. State Bd. of Edu.*, 365 S.W.3d 899, 910 (Ark. 2010) (citation omitted). Plaintiff

argues that Student was denied the benefits of an adequate and equal education because the District failed to provide Student with appropriate safety accommodations and did not maintain a safe environment for Student, as evidenced by her injuries and removal from the safety bus. However, as discussed in detail above, the District did provide accommodations for Student and updated Student's 504 plans when necessary to combat the physical injuries she sustained during the first months of school. Student was also placed back on the safety bus and did not receive any injuries after the Third 504 Plan was enacted. Further, Student succeeded academically. Plaintiffs have not provided any evidence that would allow a reasonable juror to determine Student did not receive an adequate or equal education. Plaintiffs' state law claim for deprivation of Student's constitutional rights will be dismissed with prejudice.

### c. Negligence

Count 4 of Plaintiffs' complaint alleges a negligence claim against the District and Defendant John Doe, which Plaintiff alleged was the District's liability insurer. Ark. Code Ann. § 21-9-301 states that the District is immune from suit, except for the amount of liability insurance maintained, and the insurer is directly liable. On November 23, 2021, the Court entered an order explaining Defendant John had not been served and ordered Plaintiffs to show good cause for why the claims against Defendant John Doe should not be dismissed without prejudice. Plaintiffs did not file a response and on December 2, 2021, the Court dismissed all claims against Defendant John Doe without prejudice. Because the District is immune from suit,[7] Plaintiffs' negligence claim against the District is dismissed with prejudice.

---

[7] Though Plaintiffs argue that Ark. Code Ann. § 21-9-301 is unconstitutional and therefore should not be applied, "[o]n a number of occasions, the Arkansas Supreme Court has held that [Ark. Code Ann. § 21-9-301] does not violate article 2, section 12" of the Arkansas Constitution. *Young v. Blytheville Sch. Dist.*, 425 S.W.3d 865, 872 (Ark. App. 2013) (citing *White v. City of Newport*, 933 S.W.2d 800 (1996)).

### d. Declaratory Judgment

In Count 5 of the complaint Plaintiffs seek a declaratory judgment from the Court that Ark. Code Ann. § 21-9-301 is unconstitutional and, therefore, Plaintiffs can maintain a direct negligence action against the District. Plaintiffs concede in the complaint that prior Arkansas state court opinions have found Ark. Code Ann. § 21-9-301 constitutional, however, they maintain that the statute violates Article 2 Section 13 of the Arkansas Constitution. Because of the complex issues of State law and because the Court has dismissed all claims over which it has original jurisdiction, the Court will decline to exercise jurisdiction pursuant to 28 U.S.C. § 1367(c) and the claim will be dismissed without prejudice.

## IV.  Conclusion

IT IS THEREFORE ORDERED that Defendant Bentonville School District's motion (Doc. 29) is GRANTED. Counts 1-4 of Plaintiffs' complaint are DISMISSED WITH PREJUDICE. Count 5 is DISMISSED WITHOUT PREJUDICE. Judgment will be entered separately.

IT IS SO ORDERED this 8th day of July, 2022.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
U.S. DISTRICT JUDGE